J-A20033-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| KASEIM WHITNEY, | : | |
| | : | |
| Appellant | : | No. 2941 EDA 2013 |

Appeal from the Judgment of Sentence entered on November 17, 2011
in the Court of Common Pleas of Chester County,
Criminal Division, No. CP-15-CR-0001355-2010

BEFORE: FORD ELLIOTT, P.J.E., MUNDY and MUSMANNO, JJ.

MEMORANDUM BY MUSMANNO, J.: **FILED SEPTEMBER 05, 2014**

Kaseim Whitney ("Whitney") appeals from the judgment of sentence

imposed after he was convicted of possession with intent to deliver a

controlled substance ("PWID"), firearms not to be carried without a license,

possession of a firearm with an altered manufacturer's number,[1] as well as

the summary offense of turning movements and required signals.[2] We

affirm.

The trial court extensively set forth the facts and procedural history

---

[1] **See** 35 P.S. § 780-113(a)(30); 18 Pa.C.S.A. §§ 6106(a)(1), 6110.2.

[2] **See** 75 Pa.C.S.A. § 3334(a).

underlying this appeal in its Opinion, which we adopt herein by reference. *See* Trial Court Opinion, 8/31/10, at 1-24.[3]

Following a hearing, the suppression court entered an Order denying Whitney's Motion to Suppress. The matter then proceeded to a non-jury trial, at the close of which the trial court found Whitney guilty of the above-mentioned charges.

Subsequently, on November 17, 2011, the trial court sentenced Whitney, on his PWID conviction, to a statutory term of five years in prison, and ordered him to pay the mandatory fine of $50,000. The court imposed a consecutive sentence of nine months to three years in prison for the conviction of possession of a firearm with an altered manufacturer's number, and a concurrent sentence of eighteen months to three years for the firearms not to be carried without a license conviction. The court imposed no further penalty for Whitney's summary conviction of turning movements and required signals. Whitney's counsel did not timely file a direct appeal.

Following a procedural history that is not relevant to this appeal, on August 6, 2013, Whitney filed a *pro se* Petition under the Post Conviction Relief Act ("PCRA"),[4] seeking reinstatement of his direct appeal rights, *nunc pro tunc*. The PCRA court granted relief, permitting Whitney to file an appeal *nunc pro tunc*, and appointing him counsel. Whitney timely filed a

---

[3] We note that the quantity of marijuana that the police found in Whitney's car was approximately 64 pounds.

[4] *See* 42 Pa.C.S.A. §§ 9541-9546.

Notice of Appeal. In response, the trial court ordered Whitney to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal, and Whitney timely filed a Concise Statement.

On appeal, Whitney presents for our review the following issues challenging the denial of his Motion to Suppress:

    I. Does [] Whitney, an unauthorized driver of a rental vehicle, have standing to challenge the search of the rental vehicle and his belongings contained therein?

    II. Was the stop of [] Whitney's vehicle pretextual and, if so, did the trial court err in failing to suppress physical evidence and [] Whitney's statements?

    III. Did the trial court err in failing to suppress physical evidence and [] Whitney's statements after [] Whitney was told he was free to leave?

    IV. If this was an investigatory detention, did [the] trial court err in finding that there was reasonable and articulable suspicion to support such detention?

    V. Was [] Whitney's consent to search his belongings voluntary or was it a product of an unjustified investigatory detention unsupported by reasonable suspicion that criminal activity was afoot?

Brief for Appellant at 4.

In reviewing the suppression court's denial of Whitney's Motion to Suppress, we are mindful that

> our role is to determine whether the record supports the suppression court's factual findings and the legitimacy of the inferences and legal conclusions drawn from those findings. In making this determination, we may consider only the evidence of the prosecution's witnesses and so much of the defense as, fairly read in the context of the record as a whole, remains uncontradicted. When the evidence supports the factual findings

- 3 -

of the suppression court, we may reverse only if there is an error in the legal conclusions drawn from those factual findings. As a reviewing court, we are therefore not bound by the legal conclusions of the suppression court and must reverse that court's determination if the conclusions are in error or the law is misapplied.

***Commonwealth v. Page***, 59 A.3d 1118, 1131 (Pa. Super. 2013) (brackets and citation omitted).

The Fourth Amendment to the United States Constitution and Article 1, Section 8 of the Pennsylvania Constitution protect individuals from unreasonable searches and seizures. U.S. Const. amend. IV; Pa. Const. art. 1, § 8. Generally, law enforcement must obtain a warrant prior to conducting a search; however, there are certain exceptions to the warrant requirement. ***Commonwealth v. Lagenella***, 83 A.3d 94, 102 (Pa. 2013). One such exception, implicated in the instant case, is a consensual search. ***Commonwealth v. Caban***, 60 A.3d 120, 127 (Pa. Super. 2012).

[T]he central inquiries in consensual search cases entail assessment of the constitutional validity of the citizen/police encounter giving rise to the consent, and the voluntariness of the consent given. To establish a valid consensual search, the Commonwealth must first prove that the individual consented during a legal police interaction. Where the underlying encounter is lawful, the voluntariness of the consent becomes the exclusive focus.

***Id.*** (citations omitted).

Regarding Whitney's first issue, the Commonwealth concedes that he has standing to challenge the legality of the traffic stop and search of the rental vehicle, and we agree with the Commonwealth's assessment.

- 4 -

In his second issue, Whitney argues that the stop of his vehicle was unlawful, and all of the evidence produced as a result of the stop must be suppressed because the stop was pretextual in nature, as Trooper Justin Hope ("Trooper Hope") inappropriately followed and stopped Whitney's vehicle in order to conduct a warrantless search of its contents. **See** Brief for Appellant at 24-29. Whitney points out that Trooper Hope conceded at the suppression hearing that (1) the sole reason he had decided to pursue Whitney's vehicle was because it was a rental vehicle; and (2) Trooper Hope followed Whitney for approximately *thirteen miles* to see if he would commit a Motor Vehicle Code ("Vehicle Code") violation, which would provide Trooper Hope grounds to stop the vehicle and investigate whether Whitney was involved in criminal activity. **See id.** at 24-25 (citing N.T., 6/22/10, at 76 (wherein Trooper Hope testified that "I needed to observe a violation, because that was my goal, to try to find a violation to stop that vehicle[.]")).

The undisputed evidence establishes that Trooper Hope's stop of Whitney's vehicle was clearly pretextual. However, a traffic stop that is merely a pretext for some other investigation does not automatically require the suppression of evidence found after the traffic stop. **Whren v. U.S.**, 517 U.S. 806, 812-13 (1996). In **Whren**, the United States Supreme Court established a bright-line rule that any technical violation of a traffic code legitimizes a stop, even if the stop is merely a pretext for an investigation of some other crime. **Id.**; **see also Arkansas v. Sullivan**, 532 U.S. 769, 772 (2001) (holding that a traffic violation arrest will not be rendered invalid by

- 5 -

the fact that it was a mere pretext for a narcotics search); *U.S. v. Robinson*, 414 U.S. 218, 221 n.1 (1973). This is true even if, as in the instant case, the Vehicle Code violation witnessed is a minor offense. *Commonwealth v. Chase*, 960 A.2d 108, 113 (Pa. 2008) (stating that "[t]he Fourth Amendment does not prevent police from stopping and questioning motorists when they witness or suspect a violation of traffic laws, even if it is a minor offense."). Moreover, the *Whren* Court explained that the "[s]ubjective intentions [of the officer] play no role in ordinary, probable-cause Fourth Amendment analysis." *Whren*, 517 U.S. at 813; *see also Chase*, 960 A.2d at 120 (stating that, "[i]f police can articulate a reasonable suspicion of a Vehicle Code violation, a constitutional inquiry into the officer's motive for stopping the vehicle is unnecessary.").

Here, although Whitney strenuously challenges the pretextual nature of the stop, he does not dispute that he violated section 3334(a) of the Vehicle Code by changing lanes of travel without using his vehicle's turn signal. *See* Brief for Appellant at 25, 31. Moreover, Whitney concedes that the case that he relies upon in support of his argument, *U.S. v. Hernandez*, 55 F.3d 443 (9th Cir. 1995), was effectively overruled by *Whren*, *see* Brief for Appellant at 27. In any event, *Hernandez* is not binding precedent for this Court. *See Commonwealth v. Dunnavant*, 63 A.3d 1252, 1255 n.2 (Pa. Super. 2013) (emphasizing that "[w]hile decisions of the lower federal courts have a persuasive authority, they are not binding on Pennsylvania

courts[.]"). Moreover, we are unpersuaded by Whitney's attempts to avoid the applicability of the holding in **Whren** by pointing to factual distinctions.

Accordingly, although we withhold comment regarding our opinion as to the pretextual nature of the stop and Trooper Hope's pursuit of Whitney's vehicle for thirteen miles to observe a Vehicle Code violation, we must conclude that the stop was legal.

Next, we will simultaneously address Whitney's related third, fourth, and fifth issues. Whitney argues that even if the stop of his vehicle was legal, the physical evidence and his statements that were elicited as a result of his detention were inadmissible and should have been suppressed as being the product of an unreasonable search and seizure. **See** Brief for Appellant at 14, 29-50. According to Whitney, the police interaction that occurred after Trooper Hope had informed him that he was free to leave was an unjustified investigative detention (as opposed to a "mere encounter") that was not supported by reasonable suspicion that Whitney was engaged in criminal activity. **Id.** Whitney summarizes his allegations in support of this challenge as follows:

> Having stopped [] Whitney, Trooper Hope requested his driver's license and determined that it was valid and there were no outstanding warrants for [] Whitney. Upon learning that [] Whitney was not an authorized driver of the car, the trooper returned [Whitney's] license and told him he was free to leave but he could not drive the car or walk on the turnpike. [] Whitney was given the choice of calling his girlfriend to pick him up there or allowing the trooper to drive him to the closest interchange[,] where she could meet him. Essentially, [] Whitney was not free to leave. Within seconds of informing him that he could leave, Trooper Hope, having been joined by two

more armed state troopers, began asking [] Whitney whether he had anything illegal in the car. Given all of these circumstances, [] Whitney did not believe he was free to leave and was the subject of an investigative detention without reasonable suspicion that he was involved in criminal activity.

*Id.* at 14; *see also id.* at 37 (asserting that "Whitney [was] not told that he [did] not have to respond to Trooper Hope's probing questions regarding illegal substances in the rental vehicle. … The questioning [was] pointed and unrelenting[,] with [] Whitney responding to each question in the negative."). Finally, Whitney contends that his consent to the search was invalid, as it was not voluntarily given and flowed from the illegal investigative detention. *Id.* at 51.

In its Opinion, the trial court set forth the applicable law and addressed Whitney's claims, concluding that (1) the police interaction, which occurred after Whitney was told he was free to leave, constituted a mere encounter, not an investigative detention; (2) even if the interaction did not constitute a mere encounter (and a reasonable person in Whitney's position would not have felt free to leave), Trooper Hope's questioning of Whitney constituted an investigative detention supported by reasonable and articulable suspicion of criminal activity; and (3) the search of the vehicle was lawful and Whitney's consent to the search was voluntarily given. *See* Trial Court Opinion, 8/31/10, at 35-57. Our review reveals that the trial court's thorough analysis is supported by the record and the law, and we therefore affirm on this basis with regard to Whitney's remaining issues. *See id.*

Accordingly, we conclude that the stop and search of Whitney's vehicle was lawful, and, therefore, the suppression court properly denied Whitney's Motion to Suppress.

Order affirmed.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/5/2014

s:\admin\sarch...e\Whitney Suppression.doc

COMMONWEALTH OF PENNSYLVANIA  : IN THE COURT OF COMMON PLEAS

vs.  : CHESTER COUNTY, PENNSYLVANIA

KASEIM WHITNEY  : NO. CR-0001355-2010

: CRIMINAL ACTION--LAW

*Marilyn M. Seide, Esquire, for the Commonwealth*
*Eugene P. Tinari, Esquire, for the Defendant*

## O P I N I O N

On May 5, 2010, Defendant filed an Omnibus Pretrial Motion seeking suppression of evidence. On June 22, 2010 we held an evidentiary hearing on Defendant's Motion, at which both parties appeared and were represented by counsel. Having reviewed the record and the relevant decisional and statutory law, we are now prepared to issue the following

### I. FINDINGS OF FACT

1. Trooper Justin Hope is employed as a Pennsylvania State Police Trooper as an Eastern Intelligence Officer on the Pennsylvania Turnpike. (Suppression Hearing Transcript, 6/22/10, N.T. 26).

2. Trooper Hope has been employed by the Pennsylvania State Police "[j]ust over eight years." (Suppression Hearing Transcript, 6/22/10, N.T. 26-27).

3. He has held his position as an Eastern Intelligence Officer since the beginning of May 2009. (Suppression Hearing Transcript, 6/22/10, N.T. 27).

4. As part of his employment, he has received training and experience in drug interdiction. (Suppression Hearing Transcript, 6/22/10, N.T. 27, 69-72).

RECEIVED 2014 AUG 21 PM 3:43 CLERK OF COURTS CHESTER CO. PA.

5. He has made approximately seventy-five (75) to one hundred (100) drug arrests in his career with the Pennsylvania State Police, with twenty (20) of those being within the last year as an Eastern Intelligence Officer. (Suppression Hearing Transcript, 6/22/10, N.T. 28-29).

6. On November 20, 2009, Trooper Hope was on duty, in full uniform and operating an unmarked patrol vehicle. (Suppression Hearing Transcript, 6/22/10, N.T. 29-30). Trooper Hope's patrol vehicle was equipped with lights and a siren. (Suppression Hearing Transcript, 6/22/10, N.T. 30). Trooper Hope did not have them activated. (Suppression Hearing Transcript, 6/22/10, N.T. 30). Trooper Hope's vehicle was not equipped with a video camera. (Suppression Hearing Transcript, 6/22/10, N.T. 72).

7. Trooper Hope was stationed at on the westbound on-ramp to the Turnpike at the Valley Forge Interchange. (Suppression Hearing Transcript, 6/22/10, N.T. 45).

8. The Pennsylvania Turnpike is a limited access highway upon which pedestrian traffic is not permitted. (Suppression Hearing Transcript, 6/22/10, N.T. 48, 89, 103).

9. As motorists were coming around the ramp, Trooper Hope would run their license plates. (Suppression Hearing Transcript, 6/22/10, N.T. 45).

10. Approximately five (5) minutes after he arrived at the on-ramp, Trooper Hope observed a gold Chevrolet Tahoe SUV get onto the Pennsylvania Turnpike at the Valley Forge Interchange. (Suppression Hearing Transcript, 6/22/10, N.T. 31, 33, 45, 72).

2

11.     This vehicle was not the first vehicle that passed Trooper Hope, but Trooper Hope could not remember how many others had come by previously. (Suppression Hearing Transcript, 6/22/10, N.T. 73). He testified that he had probably run a few other tags in the short time he was there. (Suppression Hearing Transcript, 6/22/10, N.T. 74-75).

12.     Trooper Hope ran the vehicle's license plate and, after a few moments, learned that it was a rental car belonging to Hertz Rental Company. (Suppression Hearing Transcript, 6/22/10, N.T. 45).

13.     Trooper Hope considered this significant because in his training and experience he has learned that drug traffickers and/or thieves often use rental vehicles to transport their merchandise. (Suppression Hearing Transcript, 6/22/10, N.T. 44, 70-72). As he testified that the use of a rental vehicle is significant

> [f]or various reasons.  One reason is if a person who is transporting large amounts of drugs happens to get caught, that we can't move to seize that vehicle because they are not the owner of the vehicle.  Another reason is because the rental vehicle is a brand new vehicle from the factory, it's not going to have any equipment violations such as window tint, after market exhaust, after market wheels that may extend past the frame of the vehicle that would be illegal.  It's a basic vehicle with no equipment violations.  It's a clean vehicle.

(Suppression Hearing Transcript, 6/22/10, N.T. 44).  Trooper Hope has been trained to look for rental vehicles as part of his drug interdiction duties. (Suppression Hearing Transcript, 6/22/10, N.T. 44).

14.     Trooper Hope pulled out of his position at the on-ramp onto the westbound Turnpike and tried to catch up to the Tahoe. (Suppression Hearing Transcript, 6/22/10, N.T. 45-46).

3

15. Trooper Hope admitted that he was following the Tahoe in the hope that he would find a Motor Vehicle Code violation so that he could effectuate a traffic stop to investigate for possible, more serious criminal activity. (Suppression Hearing Transcript, 6/22/10, N.T. 76-78).

16. When the Tahoe was approximately 2/10 of a mile ahead of him, Trooper Hope observed the Tahoe move from the right lane to the left passing lane without using the appropriate left turn signal. (Suppression Hearing Transcript, 6/22/10, N.T. 31-32).

17. Trooper Hope observed the Tahoe move back into the right lane using his right turn signal. (Suppression Hearing Transcript, 6/22/10, N.T. 31-32).

18. Trooper Hope then observed the vehicle serve within its lane twice, once towards the white fog line and once to the left towards the white "skip" or passing line. (Suppression Hearing Transcript, 6/22/10, N.T. 31).

19. Trooper Hope waited for a safe location to conduct a traffic stop for the motor vehicle code violation he had witnessed. (Suppression Hearing Transcript, 6/22/10, N.T. 31).

20. Trooper Hope conducted a vehicle stop at mile marker 312.3 westbound at approximately 9:51 a.m. (Suppression Hearing Transcript, 6/22/10, N.T. 30-31).

21. Trooper Hope and the Tahoe covered a span of approximately thirteen (13) or fourteen (14) miles on the Turnpike. (Suppression Hearing Transcript, 6/22/10, N.T. 45-46).

4

22. In making the motor vehicle stop, Trooper Hope activated his lights and just "tapped" his siren to alert the driver of the Tahoe that he wanted him to pull over. (Suppression Hearing Transcript, 6/22/10, N.T. 32).

23. Trooper Hope kept his lights on for the duration of the entire interaction for the driver's and his own safety. (Suppression Hearing Transcript, 6/22/10, N.T. 32).

24. In pulling to the side of the road, the Tahoe made a sharp right turn and came to an abrupt stop partially on the berm with his left tires still in the right travel lane. (Suppression Hearing Transcript, 6/22/10, N.T. 32).

25. Trooper Hope characterized this manner of stopping as abnormal and suggestive of a nervous driver. (Suppression Hearing Transcript, 6/22/10, N.T. 100-01).

26. Trooper Hope activated his intercom and advised the driver to move off the roadway and up ahead a short distance to a wider area where it would be safer to conduct the stop. (Suppression Hearing Transcript, 6/22/10, N.T. 32, 99).

27. The driver complied with Trooper Hope's instructions. (Suppression Hearing Transcript, 6/22/10, N.T. 32).

28. This safer, wider area is the beginning of the exit ramp to the Downingtown interchange of the westbound Turnpike. (Suppression Hearing Transcript, 6/22/10, N.T. 67). It is a wide grassy area extending approximately twenty-five (25) to thirty (30) feet before one encounters a few trees and a fence erected along the Turnpike. (Suppression Hearing Transcript, 6/22/10, N.T. 67-68). It was light outside at the time of the stop. (Suppression Hearing Transcript, 6/22/10, N.T. 68).

5

29. Trooper Hope then called his dispatch and advised them that he was "on the traffic stop with a gold Chevrolet Tahoe." (Suppression Hearing Transcript, 6/22/10, N.T. 33).

30. Trooper Hope pulled his patrol vehicle behind the Tahoe by approximately ten (10) feet, exited his patrol vehicle and walked up to the front passenger side window of the Tahoe to speak with the driver. (Suppression Hearing Transcript, 6/22/10, N.T. 33, 46).

31. Trooper Hope observed that there was only one male occupant in the Tahoe. (Suppression Hearing Transcript, 6/22/10, N.T. 33).

32. When Trooper Hope approached the Tahoe, the driver apologized for stopping the way he had initially stopped with part of his vehicle still in the roadway. (Suppression Hearing Transcript, 6/22/10, N.T. 99).

33. Trooper Hope advised the driver of who he was and why he had pulled him over. (Suppression Hearing Transcript, 6/22/10, N.T. 33).

34. Trooper Hope asked the driver for his license, vehicle registration and insurance. (Suppression Hearing Transcript, 6/22/10, N.T. 33).

35. The driver gave Trooper Hope his driver's license, which identified him as Defendant, Kaseim Whitney. (Suppression Hearing Transcript, 6/22/10, N.T. 30, 33). Trooper Hope identified Defendant in court as the person he encountered driving the Tahoe on November 20, 2009. (Suppression Hearing Transcript, 6/22/10, N.T. 30, 33).

36. Trooper Hope asked Defendant if he had rented the vehicle. (Suppression Hearing Transcript, 6/22/10, N.T. 33).

37.     Defendant replied that his aunt had rented the vehicle and had given him her permission to use it. (Suppression Hearing Transcript, 6/22/10, N.T. 33, 35). He provided the rental agreement to Trooper Hope. (Suppression Hearing Transcript, 6/22/10, N.T. 33-34).

38.     Defendant's name was not on the rental agreement as an authorized driver. (Suppression Hearing Transcript, 6/22/10, N.T. 34-35, 80, 84; 6/22/10, Exhibit C-1 [Rental Agreement]).

39.     The truth of the situation, which Trooper Hope did not know at the time of the stop, is that the vehicle was rented the previous evening by Defendant's then-girlfriend Robin Dawn Burns. (Suppression Hearing Transcript, 6/22/10, N.T. 16-17).

40.     Ms. Burns testified at the suppression hearing that she gave Defendant her permission to use the vehicle. (Suppression Hearing Transcript, 6/22/10, N.T. 17-18).

41.     Ms. Burns testified that no one at Hertz Rental Company had advised her that she could not lend the car to anyone else. (Suppression Hearing Transcript, 6/22/10, N.T. 17-18).

42.     However, the Rental Agreement covering the Tahoe expressly provided that there were to be no unauthorized drivers without Hertz Rental Company's prior written approval. (Suppression Hearing Transcript, 6/22/10, N.T. 21; 6/22/10, Exhibit C-1).

43.     Ms. Burns admitted that Defendant's name was not on the Rental Agreement and that she had not received prior written approval from Hertz authorizing Defendant to borrow the car. (Suppression Hearing Transcript, 6/22/10, N.T. 17, 21).

7

44. On this first approach to the Tahoe, Trooper Hope noted the presence of suitcases in the interior of the vehicle. (Suppression Hearing Transcript, 6/22/10, N.T. 53-54).

45. With the Rental Agreement and Defendant's Pennsylvania driver's license in his possession, Trooper Hope returned to his patrol vehicle. (Suppression Hearing Transcript, 6/22/10, N.T. 35).

46. Trooper Hope ran a license check. (Suppression Hearing Transcript, 6/22/10, N.T. 35). The result came back that Defendant's driver's license was valid. (Suppression Hearing Transcript, 6/22/10, N.T. 35). The check also indicated that Defendant was not a "wanted" person. (Suppression Hearing Transcript, 6/22/10, N.T. 35).

47. Trooper Hope then ran a criminal history check on the Defendant. (Suppression Hearing Transcript, 6/22/10, N.T. 35).

48. The criminal history check revealed that Defendant had two prior drug arrests, one being for possession with intent to deliver drugs, and that he had several prior weapon charges stemming from a single incident. (Suppression Hearing Transcript, 6/22/10, N.T. 35, 83). It also revealed that he had been arrested for DUI two weeks previous to the stop. (Suppression Hearing Transcript, 6/22/10, N.T. 51, 83). With respect to the former drug and weapons charges, the check listed the disposition as "unrecorded". (Suppression Hearing Transcript, 6/22/10, N.T. 84).

49. Out of his patrol vehicle's rearview mirror, Trooper Hope could see another Trooper behind him by approximately one- to two-tenths of a mile at another traffic stop. (Suppression Hearing Transcript, 6/22/10, N.T. 35-36, 107-08). Trooper

8

Hope called that Trooper to come up to Trooper Hope's location to assist him. (Suppression Hearing Transcript, 6/22/10, N.T. 36).

50. The other Trooper's name was Luke Straniere. (Suppression Hearing Transcript, 6/22/10, N.T. 36). Trooper Straniere has been a Pennsylvania State Trooper since September 2006. (Suppression Hearing Transcript, 6/22/10, N.T. 106). He is currently assigned to the King of Prussia barracks. (Suppression Hearing Transcript, 6/22/10, N.T. 107). Trooper Straniere was on duty on November 20, 2009 at the time of this stop. (Suppression Hearing Transcript, 6/22/10, N.T. 107). Trooper Straniere was driving a marked patrol vehicle. (Suppression Hearing Transcript, 6/22/10, N.T. 47, 107). Trooper Straniere was dressed in full uniform and armed. (Suppression Hearing Transcript, 6/22/10, N.T. 89, 107).

51. Trooper Straniere pulled his patrol vehicle up to Trooper Hope's location, parked it directly behind Trooper Hope's vehicle, and exited his patrol vehicle. (Suppression Hearing Transcript, 6/22/10, N.T. 36, 46). The lights of Trooper Straniere's patrol vehicle were activated. (Suppression Hearing Transcript, 6/22/10, N.T. 47).

52. Trooper Straniere entered Trooper Hope's patrol vehicle. (Suppression Hearing Transcript, 6/22/10, N.T. 36). Trooper Straniere sat on the backseat of Trooper Hope's patrol vehicle because Trooper Hope uses the front passenger's seat for storage of his police equipment. (Suppression Hearing Transcript, 6/22/10, N.T. 36, 109).

53. Trooper Hope advised Trooper Straniere that he had a situation involving a third-party rental vehicle in which the authorized driver was not in the vehicle. (Suppression Hearing Transcript, 6/22/10, N.T. 36). Trooper Hope advised Trooper

9

Straniere that the Defendant driving the vehicle was not an authorized driver and that he had a criminal history involving two prior drug arrests and weapons charges. (Suppression Hearing Transcript, 6/22/10, N.T. 36-37).

54. Trooper Hope advised Trooper Straniere that he was going to return to the Tahoe and speak with the driver again. (Suppression Hearing Transcript, 6/22/10, N.T. 37). Trooper Straniere stayed at Trooper Hope's patrol vehicle while Trooper Hope returned to the Tahoe. (Suppression Hearing Transcript, 6/22/10, N.T. 37). He stood outside of Trooper Hope's patrol vehicle by the rear door. (Suppression Hearing Transcript, 6/22/10, N.T. 110).

55. On this second approach to the Tahoe, Trooper Hope asked Defendant to confirm that he was not the one who rented the Tahoe and that he was not added onto the Rental Agreement. (Suppression Hearing Transcript, 6/22/10, N.T. 37-38). Trooper Hope wanted to confirm these facts before he called the rental company. (Suppression Hearing Transcript, 6/22/10, N.T. 37-38). Defendant confirmed, stating again that his aunt had rented the vehicle and he had borrowed it. (Suppression Hearing Transcript, 6/22/10, N.T. 38).

56. On this second approach to the Tahoe, Trooper Hope noticed brown boxes in the rear storage area of the Tahoe. (Suppression Hearing Transcript, 6/22/10, N.T. 54).

57. Trooper Hope testified that the presence of the brown boxes raised his suspicions of criminal activity because he knew they "could ultimately be used to transport large amounts of drugs", especially marijuana. (Suppression Hearing Transcript, 6/22/10, N.T. 54-55). He knew from speaking with other interdiction units that

10

"it's common practice right now with large boxes to be used for transporting large amounts of drugs, especially marijuana." (Suppression Hearing Transcript, 6/22/10, N.T. 54-55).

58. Trooper Hope asked Defendant where he was going. (Suppression Hearing Transcript, 6/22/10, N.T. 38). Defendant replied that he was moving to a place right off of the Downingtown exit to the Turnpike with his girlfriend and that he was taking his personal belongings to his new home. (Suppression Hearing Transcript, 6/22/10, N.T. 38).

59. Without being asked, Defendant reached back behind him to the right, opened up a suitcase and pulled out a pair of jeans, ostensibly to show Trooper Hope that he was transporting clothing, and possibly to corroborate his explanation that he was moving his clothing, not his girlfriend's. (Suppression Hearing Transcript, 6/22/10, N.T. 38).

60. Trooper Hope considered Defendant's unsolicited demonstration of the contents of his suitcase to be "odd" because Trooper Hope had not asked Defendant to search the suitcase at that point. (Suppression Hearing Transcript, 6/22/10, N.T. 102-03). Trooper Hope interpreted Defendant's action as an attempt to prove the legitimacy of his explanation of where he was going and what he was transporting. (Suppression Hearing Transcript, 6/22/10, N.T. 103).

61. Defendant also apologized a second time for the way he had pulled over previously. (Suppression Hearing Transcript, 6/22/10, N.T. 100).

62. Trooper Hope returned to his patrol vehicle and placed a phone call to his intelligence division and asked if they could do an "EPIC" check on the Defendant's

name and the vehicle. (Suppression Hearing Transcript, 6/22/10, N.T. 38-39). The acronym "EPIC" refers to the El Paso Center of Intelligence. (Suppression Hearing Transcript, 6/22/10, N.T. 39). An EPIC check would reveal if Defendant or the Tahoe had been engaged in any recent border crossings or if Defendant had any open or closed investigations by the DEA related to any kind of drugs. (Suppression Hearing Transcript, 6/22/10, N.T. 39).

63. When Trooper Hope entered his patrol vehicle at this time, Trooper Straniere also entered the rear passenger area of the Trooper Hope's patrol vehicle again. (Suppression Hearing Transcript, 6/22/10, N.T. 110-11).

64. The EPIC check revealed that in November 2007, almost to the date of the traffic stop, Defendant had been stopped in Los Angeles, California and had $87,000.00 in cash seized from his person. (Suppression Hearing Transcript, 6/22/10, N.T. 39-40).

65. Trooper Hope testified that he found this information significant, as a law enforcement agency's seizure of that amount of money is indicative of the subject being involved in illegal drug activity. (Suppression Hearing Transcript, 6/22/10, N.T. 40).

66. While Trooper Hope was at his vehicle waiting for his intelligence division to call him with the results of the EPIC check, Trooper Hope asked Trooper Straniere to call Hertz Rental Company. (Suppression Hearing Transcript, 6/22/10, N.T. 41, 84). Trooper Straniere placed the call. (Suppression Hearing Transcript, 6/22/10, N.T. 42, 111).

67. When Trooper Straniere made contact with Hertz, he learned that Defendant was not in fact listed as an authorized driver on the Rental Agreement and

12

that Hertz wanted the Troopers to tow the vehicle. (Suppression Hearing Transcript, 6/22/10, N.T. 42-43, 111-12). Trooper Straniere also made contact with a manager there by the name of Anton Wynn and obtained his consent to search the Tahoe. (Suppression Hearing Transcript, 6/22/10, N.T. 43, 111-12). Trooper Straniere communicated this information to Trooper Hope. (Suppression Hearing Transcript, 6/22/10, N.T. 42-43, 112-13).

68. Upon learning this information and the information from the EPIC check, Troopers Hope and Straniere exited Trooper Hope's patrol vehicle. (Suppression Hearing Transcript, 6/22/10, N.T. 46, 113). Trooper Hope again approached the passenger side of the Tahoe and said to Defendant, "Can you step out of the vehicle?". (Suppression Hearing Transcript, 6/22/10, N.T. 46-47). Trooper Straniere stayed to the right rear side of Trooper Hope's patrol vehicle. (Suppression Hearing Transcript, 6/22/10, N.T. 46, 113).

69. At all times, Trooper Hope spoke to Defendant in a polite, conversational and respectful manner. (Suppression Hearing Transcript, 6/22/10, N.T. 49, 114).

70. Trooper Hope asked Defendant to come to the rear right side of the Tahoe for safety purposes. (Suppression Hearing Transcript, 6/22/10, N.T. 47, 113). Defendant complied. (Suppression Hearing Transcript, 6/22/10, N.T. 47). Trooper Straniere was approximately ten (10) feet behind them. (Suppression Hearing Transcript, 6/22/10, N.T. 48).

71. After Defendant exited the vehicle, Trooper Hope asked Defendant if he had any weapons on him. (Suppression Hearing Transcript, 6/22/10, N.T. 51).

13

72. Defendant replied in the negative. (Suppression Hearing Transcript, 6/22/10, N.T. 51).

73. Trooper Hope asked Defendant if he could pat him down for weapons. (Suppression Hearing Transcript, 6/22/10, N.T. 51). In a conversational tone, Trooper Hope used the words "Can I pat you down?" (Suppression Hearing Transcript, 6/22/10, N.T. 51).

74. Defendant replied in the affirmative. (Suppression Hearing Transcript, 6/22/10, N.T. 52).

75. Trooper Hope did not find any weapons on Defendant's person. (Suppression Hearing Transcript, 6/22/10, N.T. 52).

76. Defendant then apologized a third time for the way he had initially pulled over. (Suppression Hearing Transcript, 6/22/10, N.T. 86-87, 100). Trooper Hope testified that he found Defendant's repeated apologies to be suspicious, as he his training and experience have taught him that over-apologetic behavior is an indicia of possible criminal activity. (Suppression Hearing Transcript, 6/22/10, N.T. 100).

77. Trooper Hope returned Defendant's license back to Defendant. (Suppression Hearing Transcript, 6/22/10, N.T. 48).

78. Trooper Hope told Defendant that he was not under arrest and that he was free to leave. (Suppression Hearing Transcript, 6/22/10, N.T. 48, 85, 117).

79. Trooper Hope advised Defendant, however, that because the Pennsylvania Turnpike was a limited access highway, he was not permitted to walk on the side of the road. (Suppression Hearing Transcript, 6/22/10, N.T. 48, 89).

14

80.     Trooper Hope advised Defendant that he could call someone to come and pick him up on the Turnpike and/or that Trooper Hope could give Defendant a ride to the next interchange (the Downingtown exit) where Defendant could wait for his ride. (Suppression Hearing Transcript, 6/22/10, N.T. 48, 49, 91-92, 114, 117-18).

81.     Trooper Hope stood approximately two (2) feet away from Defendant while he was telling him these things.  (Suppression Hearing Transcript, 6/22/10, N.T. 49).

82.     Trooper Hope used a polite, conversational tone of voice with the Defendant. (Suppression Hearing Transcript, 6/22/10, N.T. 49, 114).

83.     Defendant was not handcuffed.   (Suppression Hearing Transcript, 6/22/10, N.T. 49, 115).

84.     Trooper Hope did not have his gun drawn.   (Suppression Hearing Transcript, 6/22/10, N.T. 49).   Neither did Trooper Straniere.   (Suppression Hearing Transcript, 6/22/10, N.T. 115).

85.     Defendant had a cell phone on his person.   (Suppression Hearing Transcript, 6/22/10, N.T. 48).

86.     Trooper Hope paused for a few seconds to allow Defendant to make a phone call. (Suppression Hearing Transcript, 6/22/10, N.T. 68, 86).

87.     Defendant did not make a phone call.   (Suppression Hearing Transcript, 6/22/10, N.T. 48-50, 115, 118).   He did not even reach for his cell phone. (Suppression Hearing Transcript, 6/22/10, N.T. 68).

88.    Instead, Defendant asked Trooper Hope if he could drive the Tahoe off of the Turnpike because his intended destination was not very far away. (Suppression Hearing Transcript, 6/22/10, N.T. 50, 68).

89.    Trooper Hope told Defendant that he was not allowed to drive the vehicle as per the directive of the vehicle's owner, Hertz Rental Company, because Defendant was not an authorized user. (Suppression Hearing Transcript, 6/22/10, N.T. 50, 85, 114).

90.    Trooper Straniere did not speak with the Defendant while the Defendant was speaking with Trooper Hope at the rear of the Tahoe. (Suppression Hearing Transcript, 6/22/10, N.T. 115).

91.    Trooper Hope then began a subsequent round of questioning. (Suppression Hearing Transcript, 6/22/10, N.T. 50, 120).

92.    Trooper Hope asked Defendant if he had ever been arrested before. (Suppression Hearing Transcript, 6/22/10, N.T. 50). Trooper Hope testified that he wanted to "see how honest" Defendant was going to be with him. (Suppression Hearing Transcript, 6/22/10, N.T. 50).

93.    Defendant at first replied that he had not ever been arrested. (Suppression Hearing Transcript, 6/22/10, N.T. 50).

94.    A few seconds later, Defendant amended his statement and told Trooper Hope that he had been arrested a year previously for DUI. (Suppression Hearing Transcript, 6/22/10, N.T. 50-51).

95.    Trooper Hope asked Defendant whether he had ever been arrested for anything else. (Suppression Hearing Transcript, 6/22/10, N.T. 51).

16

96. Defendant replied in the negative. (Suppression Hearing Transcript, 6/22/10, N.T. 51).

97. Defendant then again asked Trooper Hope if he could drive the Tahoe. (Suppression Hearing Transcript, 6/22/10, N.T. 51). Trooper Hope again explained to him that because he was not an authorized user, he could not let him drive the vehicle. (Suppression Hearing Transcript, 6/22/10, N.T. 51).

98. Trooper Hope reiterated that Defendant could either call somebody to pick him up or Trooper Hope could give Defendant a ride to the next interchange. (Suppression Hearing Transcript, 6/22/10, N.T. 51).

99. Trooper Hope then asked Defendant whether there were any drugs or weapons in the vehicle. (Suppression Hearing Transcript, 6/22/10, N.T. 52). Defendant replied that there were not. (Suppression Hearing Transcript, 6/22/10, N.T. 52).

100. Trooper Hope then asked Defendant specifically if there was any marijuana in the vehicle, to which Defendant responded "No." (Suppression Hearing Transcript, 6/22/10, N.T. 52).

101. Defendant then, yet a third time, asked Trooper Hope if he could drive the vehicle to his girlfriend's house. (Suppression Hearing Transcript, 6/22/10, N.T. 52). Trooper Hope told him that he could not. (Suppression Hearing Transcript, 6/22/10, N.T. 52-53).

102. Trooper Hope considered this an attempt on the part of the Defendant to change the subject and testified that he found it suspicious. (Suppression Hearing Transcript, 6/22/10, N.T. 52, 101-02).

17

103. Trooper Hope then asked Defendant specifically whether there was any cocaine in the vehicle. (Suppression Hearing Transcript, 6/22/10, N.T. 53). Defendant replied that there was not. (Suppression Hearing Transcript, 6/22/10, N.T. 53).

104. Trooper Hope then asked Defendant specifically if there was any heroin in the vehicle. (Suppression Hearing Transcript, 6/22/10, N.T. 53).

105. Defendant looked down at his watch and said words to the effect that, "It's 9:00 o'clock and you're asking about drugs" and then laughed. (Suppression Hearing Transcript, 6/22/10, N.T. 53).

106. Trooper Hope then asked Defendant specifically if there were any methamphetamines in the vehicle, to which Defendant replied, "No." (Suppression Hearing Transcript, 6/22/10, N.T. 53).

107. Defendant asked Trooper Hope how he would get his clothing out of the vehicle. (Suppression Hearing Transcript, 6/22/10, N.T. 53). Trooper Hope replied that if he gave Defendant a ride, they could take the clothes with him to await his transportation at the next interchange. (Suppression Hearing Transcript, 6/22/10, N.T. 53).

108. Throughout this questioning, Defendant still had the opportunity to make a phone call, but he never did. (Suppression Hearing Transcript, 6/22/10, N.T. 88).

109. Trooper Hope asked Defendant if any of the items in the vehicle belonged to anyone but him. (Suppression Hearing Transcript, 6/22/10, N.T. 53, 98-99). Defendant replied, "No." (Suppression Hearing Transcript, 6/22/10, N.T. 53, 98-99).

18

110. Trooper Hope asked Defendant whose suitcases were in the vehicle and whose brown boxes were in the rear storage area. (Suppression Hearing Transcript, 6/22/10, N.T. 53). Defendant replied that they were his. (Suppression Hearing Transcript, 6/22/10, N.T. 53).

111. Trooper Hope told Defendant that the rental company had given their permission for Trooper Hope to search the vehicle. (Suppression Hearing Transcript, 6/22/10, N.T. 55).

112. Trooper Hope asked Defendant if he could search all of Defendant's personal belongings in the vehicle, such as the brown boxes and luggage. (Suppression Hearing Transcript, 6/22/10, N.T. 55, 99). Trooper Hope did not tell Defendant that he did not have to consent. (Suppression Hearing Transcript, 6/22/10, N.T. 88).

113. Defendant replied "Yes". (Suppression Hearing Transcript, 6/22/10, N.T. 55, 99, 116-17).

114. Trooper Straniere was still positioned a few feet behind Trooper Hope and to the right of Trooper Hope's patrol vehicle. (Suppression Hearing Transcript, 6/22/10, N.T. 55). Trooper Straniere had not moved at all during the time Trooper Hope was having this conversation with Defendant at the rear of the Tahoe. (Suppression Hearing Transcript, 6/22/10, N.T. 55).

115. However, while Trooper Hope was obtaining from Defendant a consent to search his belongings, another Trooper arrived in a marked patrol vehicle. (Suppression Hearing Transcript, 6/22/10, N.T. 55-56, 89). His name was Trooper Stropas. (Suppression Hearing Transcript, 6/22/10, N.T. 56). Trooper Stropas parked his patrol vehicle behind Trooper Straniere's vehicle. (Suppression Hearing Transcript,

19

6/22/10, N.T. 56). Trooper Stropas was in full uniform and carrying a weapon. (Suppression Hearing Transcript, 6/22/10, N.T. 89).

116. After Trooper Hope obtained Defendant's consent to search, Trooper Stropas exited his patrol vehicle and moved near to Trooper Straniere. (Suppression Hearing Transcript, 6/22/10, N.T. 56).

117. At this time, after Trooper Hope had obtained Defendant's consent to search, Trooper Straniere moved up to Trooper Hope's location to assist in the search of the vehicle. (Suppression Hearing Transcript, 6/22/10, N.T. 56-57). Trooper Hope testified that, for his own safety, he never searches a vehicle alone. (Suppression Hearing Transcript, 6/22/10, N.T. 59).

118. After obtaining Defendant's consent to search, Trooper Hope opened the rear hatch of the Tahoe. (Suppression Hearing Transcript, 6/22/10, N.T. 57). The time was approximately 10:35 a.m. (Suppression Hearing Transcript, 6/22/10, N.T. 67).

119. He observed two brown boxes on top of each other. (Suppression Hearing Transcript, 6/22/10, N.T. 57).

120. The top brown box fell out and landed on the pavement at the Troopers' feet. (Suppression Hearing Transcript, 6/22/10, N.T. 57).

121. At this point, Trooper Hope was standing right at the rear of the vehicle with Trooper Straniere. (Suppression Hearing Transcript, 6/22/10, N.T. 58).

122. Defendant was standing at the right front of Trooper Hope's patrol vehicle with Trooper Stropas. (Suppression Hearing Transcript, 6/22/10, N.T. 58). Defendant was not in handcuffs. (Suppression Hearing Transcript, 6/22/10, N.T. 58). Trooper Hope testified that Trooper Stropas and Defendant may have engaged in some

brief conversation, but that no physical contact between the two had occurred. (Suppression Hearing Transcript, 6/22/10, N.T. 59). Defendand and Trooper Stropas were standing approximately ten (10) to fifteen (15) feet away from Troopers Hope and Straniere. (Suppression Hearing Transcript, 6/22/10, N.T. 59).

123. Trooper Hope asked Defendant what was inside of the boxes. (Suppression Hearing Transcript, 6/22/10, N.T. 57). Defendant replied that his clothing was inside of the boxes. (Suppression Hearing Transcript, 6/22/10, N.T. 57).

124. Trooper Hope asked Defendant again if he could search the boxes. (Suppression Hearing Transcript, 6/22/10, N.T. 57). Defendant said "Yes." (Suppression Hearing Transcript, 6/22/10, N.T. 57).

125. Trooper Hope then told Defendant that they were taped shut and that he would have to cut them open. (Suppression Hearing Transcript, 6/22/10, N.T. 57).

126. Trooper Hope asked Defendant if he could cut the brown boxes open. (Suppression Hearing Transcript, 6/22/10, N.T. 57). Defendant said, "Go ahead, cut them open." (Suppression Hearing Transcript, 6/22/10, N.T. 57).

127. Trooper Hope proceeded to cut the first box open. (Suppression Hearing Transcript, 6/22/10, N.T. 57-58). He observed Styrofoam "peanuts" used for packaging, not clothing. (Suppression Hearing Transcript, 6/22/10, N.T. 58, 60). He also observed a thin piece of Styrofoam that was the size of the box that was on top of the contents. (Suppression Hearing Transcript, 6/22/10, N.T. 58, 60). Trooper Hope removed that piece of Styrofoam and observed a round object wrapped in green Saran wrap. (6/22/10, N.T. 58). Trooper Hope did not have to cut through the Styrofoam in

21

order to get to the Saran-wrapped package. (Suppression Hearing Transcript, 6/22/10, N.T. 62).

128. When Trooper Hope cut through the Saran wrap on the first package, he saw and smelled what he believed to be marijuana. (Suppression Hearing Transcript, 6/22/10, N.T. 63).

129. Upon observing and smelling the marijuana, Trooper Hope told Trooper Stropas to place Defendant into custody. (Suppression Hearing Transcript, 6/22/10, N.T. 63).

130. Trooper Stropas' act of taking Defendant into custody was the first time since Trooper Hope had patted Defendant down that anyone had put their hands on the Defendant. (Suppression Hearing Transcript, 6/22/10, N.T. 63).

131. When Defendant was placed into custody, the cell phone on his person was taken from him. (Suppression Hearing Transcript, 6/22/10, N.T. 103).

132. After Defendant was taken into custody, the second box was opened. (Suppression Hearing Transcript, 6/22/10, N.T. 64).

133. The second box was packaged exactly like the first, except that under the Styrofoam "peanut" packaging was a light blue piece of plastic covering the contents of the box. (Suppression Hearing Transcript, 6/22/10, N.T. 61-62). Again, after Trooper Hope cut open the second box, he did not have to cut through anything to remove the plastic covering inside. (Suppression Hearing Transcript, 6/22/10, N.T. 62).

134. There were two bundles in the second box. (Suppression Hearing Transcript, 6/22/10, N.T. 64). Trooper Hope did not cut through the Saran wrap in the second box because the contents appeared to him to be consistent with what was found inside the first box. (Suppression Hearing Transcript, 6/22/10, N.T. 64).

135. Trooper Straniere found a loaded handgun in a storage pocket located on the back of the front passenger's seat. (Suppression Hearing Transcript, 6/22/10, N.T. 64).

136. In addition to the marijuana and the loaded handgun, two cell phones were found in the vehicle. (Suppression Hearing Transcript, 6/22/10, N.T. 65). One was found in the center console area and the other was found in a storage bag that was located on the passenger side floor right behind the seat where the gun was found. (Suppression Hearing Transcript, 6/22/10, N.T. 65-67).

137. Trooper Straniere identified Defendant in court as the driver of the Tahoe whom Trooper Hope stopped on November 20, 2009. (Suppression Hearing Transcript, 6/22/10, N.T. 110).

138. A Police Criminal Complaint was filed with the Chester County Clerk of Courts on April 13, 2010.

139. The Commonwealth filed its Information on April 21, 2010, charging Defendant with one count of Violation of the Controlled Substance, Drug, Device, and Cosmetic Act, 35 P.S. § 780-113(A)(30) (Manufacture, Deliver or Possess With Intent to Manufacture or Deliver)(Count I); one count of Firearms Not to Be Carried Without a License, 18 Pa. C.S.A. § 6106(a)(Count II); one count of Possession of Firearm With

23

Altered Manufacturer's Number, 18 Pa. C.S.A. § 6110.2(a) (Count III); and one count of violating 75 Pa. C.S.A. § 3334(a), Turning Movements and Required Signals (Count IV).

140. Defendant filed an Omnibus Pre-Trial Motion for Relief on May 4, 2010. Specifically, Defendant filed a Motion to Suppress a) Physical Evidence Seized Without a Warrant, b) Physical Evidence Seized Through a Warrant, c) Confessions, Admissions or Inculpatory Statement by Defendant, and d) Identification.

141. We held an evidentiary hearing on Defendant's Motion on June 22, 2010, at which both parties appeared and were represented by counsel.

142. At the evidentiary hearing, Defendant withdrew his suppression motion as to his claim for suppression of physical evidence seized through a warrant and his claim for suppression of identification evidence. (Suppression Hearing Transcript, 6/22/10, N.T. 11). Thus, the only matters remaining for this Court to resolve involve Defendant's Motion to Suppress Physical Evidence Seized Without a Warrant and to Suppress Confessions, Admissions or Inculpatory Statement by Defendant. (Suppression Hearing Transcript, 6/22/10, N.T. 11-12).

143. Defendant filed two Briefs in support of his Motion, one which he provided to the Court at the beginning of the suppression hearing (Suppression Hearing Transcript, 6/22/10, N.T. 6) and a Supplemental Motion which he filed on July 14, 2010.

144. The Commonwealth filed its Brief in opposition on July 19, 2010.

24

## II. CONCLUSIONS OF LAW

### A. Standing

1.      "A defendant moving to suppress evidence has the preliminary burden of establishing standing and a legitimate expectation of privacy." *Commonwealth v. Burton*, 973 A.2d 428, 435 (Pa. Super. 2009).

2.      In order to establish standing, a defendant must demonstrate one of the following:

> (1) his presence on the premises at the time of the search and seizure;
>
> (2) a possessory interest in the evidence improperly seized;
>
> (3) that the offense charged includes as an essential element the element of possession; or
>
> (4) a proprietary or possessory interest in the searched premises.

*Burton*, 973 A.2d at 435.

3.      The Commonwealth has charged Defendant with three possessory offenses.

4.      "[G]enerally under Pennsylvania law, a defendant charged with a possessory offense has automatic standing to challenge a search." *Burton*, 973 A.2d at 435.

5.      "'However, in order to prevail, the defendant, as a preliminary matter, must show that he had a privacy interest in the area searched.'" *Burton*, 973 A.2d at 435 (quoting *Commonwealth v. Jones*, 874 A.2d 108, 118 (Pa. Super. 2005)).

25

6. As the Pennsylvania Superior Court stated in *Commonwealth v. Jones*,

> An expectation of privacy is present when the individual, by his conduct, exhibits an actual (subjective) expectation of privacy and that the subjective expectation is one that society is prepared to recognize as reasonable. The constitutional legitimacy of an expectation of privacy is not dependent on the subjective intent of the individual asserting the right but on whether the expectation is reasonable in light of all the surrounding circumstances.

*Burton*, 973 A.2d at 435 (*quoting Jones*, 874 A.2d at 118).

7. The Commonwealth concedes that Defendant had a legitimate expectation of privacy in the cardboard boxes Trooper Hope encountered upon opening the rear hatch of the Chevrolet Tahoe.

8. Arguably, as the cell phone which was found inside the storage bag or briefcase on the floor behind the front passenger's seat was found in a container belonging to the Defendant, Defendant would have had a similar legitimate expectation of privacy in this seized item.

9. The issue remains whether Defendant has a legitimate expectation of privacy in the rental vehicle such as to enable him to object to Trooper Hope's search of that vehicle and seizure of the cell phone found in the center console of the front seat and the firearm found in the back pocket of the front passenger's seat.

10. Our State appellate courts have not decided the issue of whether a motorist driving a rental car with the permission of an absent lessee but without the knowledge or permission of the rental company has a legitimate expectation of privacy in that vehicle for search and seizure purposes.

11. Turning to the Federal courts for guidance, a survey of the relevant Federal jurisprudence indicates that the Third Circuit Court of Appeals has not decided this issue and the Federal Courts of Appeals in other jurisdictions are split. *United States v. Thomas*, 447 F.3d 1191, 1196-97 (9th Cir. Wash. 2006)(collecting cases and analyzing the Circuit split); *United States v. Dennis*, 2007 WL 2173394 (E.D. Pa. 2007), *adhered to by* 2008 WL 2381549 (E.D. Pa. 2008)(*discussing Thomas, supra*); *United States v. Kennedy*, 2007 WL 1740747 (E.D. Pa. 2007)(*discussing Thomas, supra*).

12. According to *United States v. Thomas*, 447 F.3d 1191 (9th Cir. Wash. 2006), there are three extant approaches to solving this problem.

13. The first approach, which the *Thomas* Court considers the majority approach, is discerned from the Fourth, Fifth and Tenth Circuits, which have adopted a bright-line test holding that an individual who is not listed on a rental agreement has no standing to object to a search of the rental vehicle he or she is operating. *Thomas*, 447 F.3d at 1196-97.

14. The rationale behind this rule is that the driver has no expectation of privacy in the vehicle because he has no property or possessory interest in it. *Id.*

15. The second approach, which is "seen in the Eighth Circuit, is a modification of the majority bright-line approach, and generally disallows standing unless the unauthorized driver can show he or she had the permission of the authorized driver." *Thomas*, 447 F.3d at 1197. *See also United States v. Kennedy*, 2007 WL 1740747 * 3 (E.D. Pa. 2007)(noting that this approach is utilized in the Ninth Circuit as well).

16. The third approach, recognized in the Sixth Circuit, according to *Thomas, supra*, embraces a "broad presumption against granting unauthorized drivers

27

standing to challenge a search", but rejects a bright-line test in favor of an examination of the totality of the circumstances with particular attention to five factors: (a) whether the defendant had a driver's license; (b) the relationship between the unauthorized driver and the lessee; (c) the driver's ability to present rental documents; (d) whether the driver had the lessee's permission to use the car; and (e) the driver's relationship with the rental company. *Thomas*, 447 F.3d at 1197.

17. The Eastern District Court of Pennsylvania has predicted that, if faced with this issue on appeal, the Third Circuit Court of Appeals would adopt either the Eighth Circuit's modified bright-line test or the five-factor totality of the circumstances test of the Sixth Circuit. *United States v. Dennis*, 2007 WL 2173394 * 6 (E.D. Pa. 2007), *adhered to by* 2008 WL 2381549 (E.D. Pa. 2008)(agreeing with *Kennedy*, *supra*); *United States v. Kennedy*, 2007 WL 1740747 * 4 (E.D. Pa. 2007)(interpreting the Third Circuit's decision in *United States v. Baker*, 221 F.3d 438 (3rd Cir. Pa. 2000) as an "implicit endorsement of either the modified bright-line rule or the totality of the circumstances test.").

18. In *United States v. Baker*, 221 F.3d 438, 442 (3rd Cir. Pa. 2000), the Third Circuit Court of Appeals for Pennsylvania stated that "whether the driver of a car has the reasonable expectation of privacy necessary to show Fourth Amendment standing is a fact-bound question dependent on the strength of his interest in the car and the nature of his control over it; ownership is not necessary."

19. Under the modified bright-line test of the Eighth and Ninth Circuits, we find Defendant would have a legitimate expectation of privacy in the rental vehicle.

28

20. The lessee, Robyn Dawn Burns, testified that she gave Defendant permission to operate the Chevrolet Tahoe she leased from Hertz Rental Car. (Suppression Hearing Transcript, 6/22/10, N.T. 17).

21. Under the Sixth Circuit's five-factor/totality of the circumstances test, it is arguable whether Defendant had a legitimate expectation of privacy in the vehicle.

22. With respect to the five factors, the first four factors weigh in favor of a finding of a legitimate expectation of privacy.

23. Defendant had a driver's license, he had at the time an intimate social relationship with the lessee, he presented the rental documents to Trooper Hope and he had the lessee's permission to use the vehicle.

24. The only factor against the legitimacy of his expectation of privacy is the last. He had no relationship with the rental car company and was not an authorized driver on the lease. The lease stated that no other drivers were to use the vehicle without the prior written consent of the rental car company.

25. In light of the "broad presumption" against granting unauthorized drivers standing that accompanies the Sixth Circuit's totality of the circumstances test, Defendant's lack of any connection to the rental company weighs heavily in this Court's consideration.

26. Notwithstanding Defendant's inability to fulfill the fifth factor in the Sixth Circuit's test, as the majority of the factors support the existence of a legitimate expectation of privacy, we would be inclined to find that Defendant did indeed have not only a subjective expectation of privacy in the vehicle's interior, but one that society would be prepared to recognize as reasonable.

27. Nevertheless, the fact that Defendant may have had a legitimate expectation of privacy in the interior of the Chevrolet Tahoe does not terminate our inquiry or resolve the ultimate issue in Defendant's favor.

28. Even *Thomas*, *supra*, contemplates that a possessor's expectation of privacy allows him to exclude all but the true owner. *Thomas*, 447 F.3d at 1198. *See also State v. Likins*, 903 P.2d 764 (Kan. App. 1995)(if a defendant has a sufficient possessory interest and expectation of privacy in a vehicle, he or she can exclude anyone from the vehicle except the true owner).

29. The best scenario Defendant could assert is that he should be considered as having joint control or common authority with Hertz Rental Car (hereinafter, "Hertz") with respect to the Chevrolet Tahoe.

30. However, such a claim would be defective in that Defendant was operating the Chevrolet Tahoe without the permission or knowledge of Hertz, the true owner.

31. Defendant did not possess common authority with Hertz Rental Car Company.

32. Hertz consented to the search of its Chevrolet Tahoe by the Pennsylvania State Police.

33. Hertz' authority to consent to the search of the Chevrolet Tahoe as the vehicle's owner is superior to Defendant's authority to exclude the police from the interior of the vehicle. *See United States v. Schofield*, 80 Fed. Appx. 798 (3rd Cir. Pa. 2003), *cert. denied*, 124 S.Ct. 2051 (U.S. Pa. 2004)(owner's consent to search trumped objection of defendant driver).

30

34.    Other jurisdictions that have considered similar factual scenarios have upheld the validity of the owner's consent to the search over the possessor's objection. *See also Johnson v. Commonwealth*, 2003 WL 22006022 (Va. App. 2003)(a warrantless search of a motor vehicle without probable cause may nevertheless be valid as a consensual search, provided that the person who consents has actual authority to do so. The owner's property right is superior to the bailee's temporary possessory right and expectations of privacy in the vehicle. An owner of a motor vehicle may consent to a search of the vehicle over a bailee's objections if, at the time of the consent, the owner was either in possession or entitled to possession of the vehicle); *State v. Likins*, 903 P.2d 764 (Kan. App. 1995)(defendant's right to preclude search of automobile was inferior to that of owner of automobile, so he had no standing to challenge search if consent of owner was given freely and voluntarily, where defendant indicated that he did not own the automobile and did not believe he had the authority to give permission for search, and owner of automobile gave permission for the search); *Hardy v. Commonwealth*, 440 S.E.2d 434 (Va. App. 1994)(owner-bailor could consent to search of automobile over bailee's objection, so long as bailment was at owner-bailor's will; while bailee may have expectation of privacy in borrowed vehicle, that privacy interest is subordinate to the owner's right to his vehicle and right to reclaim possession of the vehicle at any time).[1]

---

[1] We would submit that Defendant's status does not even rise to the level of bailee, as he did not hold the property with Hertz' permission or knowledge. There was no contract between Hertz and Defendant; Defendant was in fact expressly prohibited from operating the Tahoe by the terms of the contract between Hertz and the lessee, Ms. Burns. Further, to the extent that a parallel is necessary, because Defendant was not an authorized operator of the Tahoe, Hertz was at least entitled to demand possession within the meaning of *Hardy, supra* and *Johnson, supra*, discussed above.

31

35. Thus, we conclude that, although Defendant may have had standing to object to the officers' search of the Chevrolet Tahoe, Defendant's standing as an unauthorized driver is subordinate to Hertz' authority as true owner to consent.

### B. Validity of Stop

36. Where a motion to suppress has been filed, the burden is on the Commonwealth to establish by a preponderance of the evidence that the challenged evidence is admissible. *Commonwealth v. Powell*, 994 A.2d 1096 (Pa. Super. 2010).

37. A preponderance of the evidence has been defined as proof that something is more likely than not. *Commonwealth v. Clark*, 683 A.2d 901 (Pa. Super. 1996).

38. The Fourth Amendment to the United States Constitution provides

The right of people to be secure in their persons, houses, papers, and effect, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized.

United States Const., Amend. IV.

39. Article I, Section 8 of the Pennsylvania Constitution provides

The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant.

Pa. Const., Art. I, § 8.

40. The Federal and State Constitutions protect individuals from unreasonable searches and seizures, thereby ensuring the right of each individual to be

32

let along. *Commonwealth v. By*, 812 A.2d 1250 (Pa. Super. 2002), *appeal denied*, 839 A.2d 350 (Pa. 2003).

41. Evidence obtained from unreasonable searches and seizures is inadmissible at trial. *Commonwealth v. Pratt*, 930 A.2d 561 (Pa. Super. 2007), *appeal denied*, 946 A.2d 686 (Pa. 2008).

42. A warrantless search or seizure is presumptively unreasonable under the Fourth Amendment and the Pennsylvania Constitution, subject to a few specifically established, well-delineated exceptions. *Commonwealth v. McCree*, 924 A.2d 621 (Pa. 2007). *See also Commonwealth v. Chase*, 960 A.2d 108 (Pa. 2008)(provision of State Constitution protecting against unreasonable searches and seizures is the same as the Fourth Amendment for *Terry* purposes).

43. Police officers may not conduct a warrantless search or seizure unless one of several recognized exceptions applies. *Commonwealth v. By*, 812 A.2d 1250 (Pa. Super. 2002), *appeal denied*, 839 A.2d 350 (Pa. 2003).

44. One exception to the prohibition against unreasonable searches is a search conducted pursuant to consent voluntarily given. *Commonwealth v. By*, 812 A.2d 1250 (Pa. Super. 2002), *appeal denied*, 839 A.2d 350 (Pa. 2003).

45. Fourth Amendment inquiries in consent to search cases entail a two-prong assessment: (1) the constitutional validity of the citizen/police encounter giving rise to the consent and (2) the voluntariness of said consent. *Commonwealth v. By*, 812 A.2d 1250 (Pa. Super. 2002), *appeal denied*, 839 A.2d 350 (Pa. 2003).

46. Trooper Hope's initial stop of this Defendant was lawful.

47. A police officer may stop a vehicle if he or she has probable cause to believe the driver has committed a non-DUI Motor Vehicle Code violation. *Commonwealth v. Chase*, 960 A.2d 108 (Pa. 2008).

48. Probable cause is defined as a reasonable belief, based on the surrounding facts and totality of the circumstances, that an illegal activity is occurring or evidence of a crime is present. *Commonwealth v. Petroll*, 738 A.2d 993 (Pa. 1999).

49. Trooper Hope observed Defendant's vehicle change lanes without the use of a turn signal. (Suppression Hearing Transcript, 6/22/10, N.T. 31).

50. Changing lanes without the use of a turn signal is a violation of the Motor Vehicle Code. *See* 75 Pa. C.S.A. § 3334.

51. Trooper Hope had probable cause to believe that Defendant had committed a violation of the Motor Vehicle Code.

52. Any technical violation of a traffic code legitimizes a traffic stop, even if the stop is merely a pretext for an investigation of some other crime. *United States v. Mosley*, 454 F.3d 249 (3rd Cir. Pa. 2006).

53. The constitutionality of a traffic stop does not depend on the subjective motivation of the officer making the stop. *Whren v. United States*, 116 S.Ct. 1769 (U.S. D.C. 1996); *Commonwealth v. Chase*, 960 A.2d 108 (Pa. 2008)(if police can articulate the requisite quantum of cause, "a constitutional inquiry into the officer's motive for stopping the vehicle is unnecessary.").

54. This is true even if the Motor Vehicle Code violation witnessed is a minor offense. *Commonwealth v. Chase*, 960 A.2d 108, 113 (Pa. 2008)("The Fourth

34

Amendment does not prevent police from stopping and questioning motorists when they witness or suspect a violation of traffic laws, even if it is a minor offense.").

55.     Even if his initial detention is deemed lawful, Defendant argues that the validity of the stop eroded once Trooper Hope engaged him in a subsequent round of questioning after telling Defendant he was free to leave.

56.     Where the purpose of an initial, valid traffic stop has ended and a reasonable person would have believed that he was free to leave, the law characterizes a subsequent round of questioning by the officer as a mere encounter. *Commonwealth v. By*, 812 A.2d 1250 (Pa. Super. 2002), *appeal denied*, 839 A.2d 350 (Pa. 2003).

57.     Since the citizen is free to leave, he is not detained, and the police are free to ask questions appropriate to a mere encounter, including a request for permission to search a vehicle. *Commonwealth v. By*, 812 A.2d 1250 (Pa. Super. 2002), *appeal denied*, 839 A.2d 350 (Pa. 2003).

58.     However, where the purpose of an initial traffic stop has ended and a reasonable person would not have believed that he was free to leave, the law characterizes a subsequent round of questioning by the police as an investigative detention or arrest. *Commonwealth v. By*, 812 A.2d 1250 (Pa. Super. 2002), *appeal denied*, 839 A.2d 350 (Pa. 2003).

59.     If the underlying detention violates the Fourth Amendment, then any evidence seized during that stop must be excluded as fruit of an unlawful detention absent a demonstration by the government of a sufficient break in the causal chain between the illegal detention and the seizure of evidence, thus assuring that the search is

35

not an exploitation of the prior illegality, and voluntariness. *Commonwealth v. By*, 812 A.2d 1250 1255 (Pa. Super. 2002), *appeal denied*, 839 A.2d 350 (Pa. 2003).

60. Arguably, the purpose behind Trooper Hope's initial traffic stop of this Defendant was to investigate a possible drug offense.

61. On the theory that Trooper Hope's stop of Defendant was a pretext for his further investigation of Defendant for possible illegal drug activity, it is arguable that the purpose of Trooper Hope's initial stop of Defendant did not, in fact, end once Trooper Hope told Defendant that he was free to leave.

62. Alternatively, we conclude that a reasonable person in Defendant's position would have believed he was free to leave when Trooper Hope told him so, and that, consequently, Trooper Hope's subsequent round of questioning constituted only a mere encounter.

63. In *Commonwealth v. Moyer*, 954 A.2d 659 (Pa. Super. 2008), *appeal denied*, 966 A.2d 571 (Pa. 2009), the Pennsylvania Superior Court articulated a non-exclusive list of factors to be used in determining whether police conducted a mere encounter or a constitutional seizure after the completion of a valid traffic stop.

64. This list includes: (1) the presence or absence of police excesses; (2) whether there was physical contact; (3) whether police directed the citizen's movements; (4) police demeanor and manner of expression; (5) the location of the interdiction; (6) the content of the questions and statements; (7) the existence and character of the initial investigative detention, including its degree of coerciveness; (8) the degree to which the transition between the traffic stop/investigative detention and the subsequent encounter can be viewed as seamless, thus suggesting to a citizen that his

36

movements may remain subject to police restraint; (9) the presence of an express admonition to the effect that the citizen-subject is free to depart is a potent, objective factor; and (10) whether the citizen has been informed that he is not required to consent to the search. *Commonwealth v. Moyer*, 954 A.2d 659 665 (Pa. Super. 2008), *appeal denied*, 966 A.2d 571 (Pa. 2009).

65.     In the matter *sub judice*, an examination of these factors suggests that the subsequent interaction between Defendant and Trooper Hope constituted a mere encounter.

66.     First, there were no police excesses.  The other two Troopers who arrived at the scene after Trooper Hope were present for officer safety purposes.  We do not consider their presence to render the interaction unconstitutionally coercive.  *See Commonwealth v. By*, 812 A.2d 1250 1258 (Pa. Super. 2002), *appeal denied*, 839 A.2d 350 (Pa. 2003)(presence of three officers at nighttime stop did not make subsequent interaction an investigative detention).

67.     The only physical contact occurred when Trooper Hope asked Defendant to exit his vehicle and Trooper Hope proceeded to pat Defendant down for weapons.  However, prior to patting Defendant down, Trooper Hope asked Defendant for his permission to conduct the frisk.  Further, this contact occurred prior to the termination of the first interaction.

68.     The only time Trooper Hope arguably directed Defendant's movements, after pulling him over, was to ask Defendant to exit his vehicle.   This directive occurred prior to the conclusion of the first interaction. *See Commonwealth v. Rodriguez*, 695 A.2d 864 868-69 (Pa. Super. 1997)(in the course of a valid stop for a traffic

violation, police may request both drivers and their passengers to alight from a lawfully stopped car without reasonable suspicion that other criminal activity is afoot).

69.    At all times, Trooper Hope's demeanor and manner of expression was polite and conversational.

70.    The location of the interdiction was the berm of the Pennsylvania Turnpike, a busy limited access public highway.

71.    The content of the questions and statements were aimed at testing Defendant's credibility and ferreting out further criminal activity.    Arguably, this factor weighs in favor of a conclusion that the subsequent interaction constituted an investigative detention.

72.    The existence and character of the initial detention was not unduly coercive.  Trooper Hope was driving an unmarked car.  He only activated his lights and "tapped" his siren to alert Defendant to the fact that he wanted him to pull over. Defendant was not handcuffed or placed in a police vehicle during this interaction and Trooper Hope did not have his gun drawn.  There is no evidence indicating that either of the other two Troopers had their weapons drawn.  Trooper Hope's colloquy with Defendant was cordial and conversational.  The stop occurred in the daytime hours of the morning, at approximately 9:51 a.m., on a well traveled public highway.

73.    Although certainly the stop had some indicia of coerciveness, as is to be expected when a uniformed officer directs a motorist to pull over to the side of the road and two additional uniformed officers driving marked cars pull up behind him, we do not consider the presence of these two additional Troopers, who were called for officer

38

safety purposes, so coercive as to convert this subsequent interaction into an investigative detention.

74. With respect to the eighth factor, the degree to which the transition between the traffic stop/investigative detention and the subsequent encounter can be viewed as seamless, a few seconds elapsed between the time that Trooper Hope told Defendant that he was free to leave and the time Trooper Hope began questioning Defendant anew. Arguably, this factor suggests that the interaction was of a more intrusive character.

75. Trooper Hope told Defendant that he was free to leave.

76. Of course, the means by which Defendant could accomplish his egress were limited, not due to any conduct of Trooper Hope, but due to the fact that Defendant had been traveling and was stopped on a limited access highway, on which pedestrian travel is prohibited. Further, Defendant was unable to drive the Chevrolet Tahoe because he was an unauthorized user and the Tahoe's true owner, Hertz, had instructed the police to have it towed.

77. Trooper Hope offered Defendant the option of either calling someone to come pick him up or getting a ride to the nearest Turnpike interchange from the Trooper, the only option available to Defendant on a limited access highway.

78. Defendant did not avail himself of either option, although he had a cell phone on his person.

79. Trooper Hope did not inform Defendant that he was permitted to decline Trooper Hope's request to search his personal belongings.

39

80. Although such an admonition would have been helpful to our analysis, it is neither mandatory nor determinative. *See Commonwealth v. Smith*, 836 A.2d 5 [14] (Pa. 2003)("[T]he mere fact that appellant was not specifically informed that she could refuse to cooperate and was free to end the encounter did not make the encounter a seizure for Fourth Amendment purposes.").

81. Finally, we must take into consideration the maturity, sophistication and mental or emotional state of the Defendant, including his age, intelligence and capacity to exercise free will. *Commonwealth v. Moyer*, 954 A.2d 659 668 n. 5 (Pa. Super. 2008), *appeal denied*, 966 A.2d 571 (Pa. 2009)(*quoting Commonwealth v. Strickler*, 757 A.2d 884 (Pa. 2000)).

82. We have no reason to conclude that Defendant is other than a reasonably intelligent young adult with no impairment in his ability to exercise his own volition. There is further no reason to conclude that, on the morning of the stop, Defendant was in an unduly agitated or compromised mental and/or emotional state; all of the evidence, including his compliance with Trooper Hope's requests, his presence of mind as demonstrated by his showing Trooper Hope the clothing inside his suitcase, and the attempts to cover up or mislead Trooper Hope as to his criminal history, points to the contrary.

83. Despite the presence of a few, limited elements that might be considered official compulsion, we conclude, based on the time and location of the stop, Trooper Hope's cordial, conversational manner, the absence of physical force threatened or used, Trooper Hope's admonition to Defendant that he was free to leave, and Defendant's relative sophistication, that the totality of the circumstances weighs in favor

40

of a determination that Trooper Hope's subsequent questioning of Defendant after telling him he was free to go constituted a mere encounter.

84.    Alternatively, we conclude that, if a reasonable person in Defendant's position would not have felt free to leave after Trooper Hope told him to do so, Trooper Hope's subsequent round of questioning directed towards this Defendant constituted an investigative detention that was supported by reasonable suspicion of criminal activity.

85.    Reasonable suspicion exists when an officer is able to articulate specific observations which, when considered with reasonable inferences derived therefrom, lead to a reasonable conclusion, in light of the officer's experience, that criminal activity is afoot and the person seized was engaged in the criminal activity. *Commonwealth v. Bailey*, 947 A.2d 808, 811 (Pa. Super. 2008), *appeal denied*, 959 A.2d 927 (Pa. 2008).

86.    At the time Trooper Hope began questioning Defendant after telling him he was free to leave, Trooper Hope possessed the following information.

87.    Defendant was driving a rental car for which he was not an authorized driver. Trooper Hope testified that the fact that Defendant was operating a rental car, especially as an unauthorized driver, raised his suspicions because third-party rentals are often utilized to mask drug trafficking activity.

88.    Defendant had committed a motor vehicle traffic violation, namely, switching lanes without a proper signal.

89.    Additionally, when he pulled over to the side of the road at Trooper Hope's instigation, Defendant made an "abrupt sharp like right-hand" turn and came to an abrupt stop, with his left tires still in the right travel lane. Trooper Hope testified that

41

Defendant's manner of stopping was strange and unsafe, and evidence of the possibility that Defendant may have been nervous.

90.    Defendant had two prior drug arrests, one being for possession with intent to deliver drugs. He also had several related charges involving a weapon and had been arrested for DUI two weeks prior.

91.    An EPIC check of Defendant's name also revealed that in 2007 Defendant had been stopped in Los Angeles, California and $87,000.00 in cash was seized from him. Trooper Hope testified that this fact raised a red flag in his mind because such a large quantity of cash on a person is indicative of drug activity.

92.    In addition to his unsafe manner of stopping, Defendant behaved strangely in other ways, in that he apologized multiple times for the way in which he had pulled his vehicle to the side of the road and he opened up his suitcase without being asked in order to show Trooper Hope that he was in fact transporting clothing. Trooper Hope testified that he has been trained to regard over-apologetic behavior as suspicious.

93.    On Trooper Hope's second approach to Defendant's vehicle, before the last approach when he asked Defendant to exit his vehicle, Trooper Hope observed brown boxes in the rear storage area of the Tahoe. In Trooper Hope's experience and training, the presence of these boxes was significant because they are associated with drug trafficking.

94.    At the time he began questioning Defendant anew after telling him he was free to go, Trooper Hope knew that Defendant was a third-party unauthorized operator of a rental vehicle, that he had a prior criminal history of drug, DUI and weapons offenses, that he was behaving in a strange manner indicative of nervousness and/or a

42

guilty conscience, and he was transporting brown boxes, which are associated with drug trafficking, in the Tahoe. He had also committed a traffic violation.

95. Trooper Hope had reasonable suspicion to believe that Defendant may have been engaged in drug trafficking.

96. In *Commonwealth v. Kemp*, 961 A.2d 1247 (Pa. Super. 2008), the Pennsylvania Superior Court held that facts gathered during a valid traffic stop may be utilized to justify an investigatory detention occurring after a police officer has indicated that a defendant is free to leave.

97. Trooper Hope was thus entitled to draw on the facts he observed during his valid traffic stop in order to formulate the reasonable suspicion necessary to support the validity of his subsequent questioning of this Defendant after advising him that he was free to leave.

98. Because Trooper Hope had reasonable suspicion to believe Defendant may have been engaged in criminal activity, Trooper Hope's subsequent questioning of Defendant after telling him he was free to go, if it constituted an investigative detention, was supported by the requisite quantum of cause and constituted a valid interaction between Trooper Hope and Defendant.

99. Defendant was not subjected to a custodial detention.

100. The standard for determining whether an encounter with the police is deemed custodial is an objective one based on the totality of the circumstances, with due consideration given to the reasonable impression conveyed to the person interrogated. *Commonwealth v. Schwing*, 964 A.2d 8 (Pa. Super. 2008), *appeal denied*, 989 A.2d 916 (Pa. 2009).

43

101. Police detentions become custodial when, under the totality of the circumstances, the conditions and/or duration of the detention become so coercive as to constitute the functional equivalent of arrest. *Commonwealth v. Schwing*, 964 A.2d 8[11] (Pa. Super. 2008), *appeal denied*, 989 A.2d 916 (Pa. 2009).

102. The factors a court utilizes to determine, under the totality of the circumstances, whether a detention has become so coercive as to constitute the functional equivalent of arrest include: the basis for the detention; its length; its location; whether the suspect was transported against his or her will, how far and why; whether restraints were used; whether the law enforcement officer showed, threatened or used force; and the investigative methods employed to confirm or dispel suspicions. *Commonwealth v. Schwing*, 964 A.2d 8[12] (Pa. Super. 2008), *appeal denied*, 989 A.2d 916 (Pa. 2009)(*Miranda* case); *Commonwealth v. Teeter*, 961 A.2d 890 (Pa. Super. 2008)(character of detention case).

103. In the matter *sub judice*, an analysis of the foregoing factors supports the conclusion that Defendant's detention did not become custodial until Trooper Hope instructed Trooper Straniere to place Defendant under arrest following Trooper Hope's discovery of marijuana in the brown boxes found in the rear storage area of the Tahoe.

104. The basis for the detention was, ostensibly, to cite Defendant for a motor vehicle code traffic violation. In the course of lawfully detaining Defendant on the basis of his traffic violation, Trooper Hope had the subjective intent to investigate the possibility of other criminal activity which his training and experience suggested to him might be present on the basis of Defendant's operation of a rental vehicle.

44

105. With respect to the second factor, the length of the detention, we infer, from the testimony that approximately twenty (20) to thirty (30) minutes had elapsed between the time of the stop and the time that Trooper Straniere made contact with Hertz, which was immediately prior to Trooper Hope asking Defendant to exit the automobile, and from the fact that Trooper Hope opened the rear hatch of the Tahoe at 10:35 a.m., that the entire investigatory period lasted approximately forty-five (45) to fifty-five (55) minutes, that is, less than one hour, including therein a reasonable period for the pat-down to occur, for the relatively brief "subsequent questioning" Trooper Hope engaged in with Defendant, and for Trooper Hope to open the brown box that fell from the vehicle and discover that it contained marijuana.

106. The location of the detention was a very public area, the berm of the Pennsylvania Turnpike, a place where, it may be presumed, motor vehicle stops are fairly commonplace.

107. Defendant was not transported anywhere against his will prior to the time Trooper Straniere formally placed him under arrest.

108. No restraints were used.

109. In fact, at the arguable conclusion of the traffic stop portion of the interaction, Defendant was expressly informed that he was free to leave.

110. No force was used or threatened. Arguably, some indicia of force was shown in the fact of the officers' uniforms, marked cars, and number, but these indicia may also have served the purpose to assure the Defendant that he was being detained by actual law enforcement officers, as opposed to someone posing as a law

45

enforcement officer, as well as to promote officer safety. These indicia were not, in and of themselves, so coercive as to render the interaction custodial.

111. The investigatory methods employed to confirm or dispel suspicions included running computer checks of Defendant's driver's license and criminal history, questioning Defendant briefly, and cordially requesting permission to search his personal belongings. Trooper Hope acted at all times with professional courtesy and a polite demeanor. The computer checks of Defendant's driver's license and criminal history involved only a minimal intrusion on Defendant's time and privacy and the search of Defendant's personal belongings was accomplished with Defendant's consent.

112. The only factors that support a finding of a custodial detention are Trooper Hope's subjective intent to conduct an investigation for a non-traffic offense, which as we stated above is not controlling in determining the character of a detention, *Whren v. United States*, 116 S.Ct. 1769 (U.S. D.C. 1996); *Commonwealth v. Chase*, 960 A.2d 108 (Pa. 2008), possibly the length of time of the stop, and the presence of three uniformed officers, two of whom drove marked cars.

113. The overwhelming weight of the remaining factors supports a determination that Defendant's interaction with the Troopers was, at its most arguably intrusive, an investigatory detention supported by reasonable suspicion that criminal activity was afoot. Defendant was not physically restrained, no force was used or threatened, he was not transported anywhere against his will, the Troopers were at all times polite, conversational, and respectful of the Defendant, their investigative methods were either minimally intrusive or accomplished with the consent of the Defendant, the detention occurred not, for example, in an interview room at the State Police barracks,

46

but on the berm of the Turnpike, which is a public place where vehicle stops are, presumably, relatively commonplace and even expected, and Defendant was expressly informed that he was free to leave.

114. Under the circumstances, we find that the reasonable impression conveyed to this Defendant was that he was being temporarily detained for investigatory purposes, not that he was under arrest or subjected to police custody.

115. Consequently, we conclude that Defendant was not subjected to a custodial detention.

116. At arguably its most intrusive, Defendant was subjected to a valid investigative detention supported by reasonable suspicion.

### C. Voluntariness of Consent to Search

117. Where the underlying encounter between police and a defendant is found to be lawful, the voluntariness of the defendant's consent to search becomes the exclusive focus in determining the validity of the search. *Commonwealth v. By*, 812 A.2d 1250 (Pa. Super. 2002), *appeal denied*, 839 A.2d 350 (Pa. 2003).

118. The factors to be employed in determining whether consent to a warrantless search is voluntarily given mirror those used to determine whether a citizen-police interaction following the conclusion of a valid traffic stop is a mere encounter or a seizure in all but one respect[2] and may be set forth as follows:

(1) the presence of absence of police excesses;

---

[2] The difference is that the voluntariness factors do not examine the degree to which the transition between the conclusion of a traffic stop and a subsequent encounter may be said to be seamless. *See Commonwealth v. Moyer*, 954 A.2d 659 (Pa. Super. 2008), *appeal denied*, 966 A.2d 571 (Pa. 2009)(addressing the factors to be utilized in determining whether an interaction subsequent to the conclusion of a valid traffic stop is a mere encounter or constitutional seizure).

47

(2) whether there was physical contact;

(3) whether police directed the citizen's movements;

(4) police demeanor and manner of expression;

(5) the location of the interdiction;

(6) the content of the questions and statements;

(7) the existence and character of the initial investigative detention, including its degree of coerciveness;

(8) whether the person has been told that he is free to leave; and

(9) whether the citizen has been informed that he is not required to consent to the search.

*Commonwealth v. Kemp*, 961 A.2d 1247 1253 (Pa. Super. 2008).

119. Our analysis of these factors leads this Court to conclude that Defendant's consent to the search of his personal belongings, including the brown boxes and the storage bag in which one of the cell phones was found, was voluntary.

120. First, as we mentioned previously, there were no police excesses beyond, arguably, the fact that Trooper Hope called for back up and two other uniformed Troopers arrived in marked vehicles. Again, Trooper Hope called for back up for officer safety purposes, not to intimidate this Defendant.

121. The only physical contact occurred when Trooper Hope patted Defendant down, again for officer safety purposes and only after asking Defendant if he would permit Trooper Hope to do so. Defendant gave his permission.

122. Arguably, Trooper Hope directed Defendant's movements to some extent in that he directed Defendant to pull his vehicle over for a lawful traffic stop and

48

then later requested that Defendant exit the vehicle and move to the rear so as not to pose a safety hazard with respect to oncoming motorists. *But see Commonwealth v. Rodriguez*, 695 A.2d 864 (Pa. Super. 1997)(in the course of a valid stop for a traffic violation, police may request both drivers and their passengers to alight from a lawfully stopped car without reasonable suspicion that other criminal activity is afoot).

123. At all times, Troopers Hope, Straniere and Stropas were cordial, conversational, and respectful to the Defendant.

124. The interdiction occurred on the berm of the Pennsylvania Turnpike, a public place where traffic stops are commonplace.

125. The content of the questions and statements reveals that Trooper Hope was engaged in an effort to investigate possible criminal activity beyond the traffic violation. Defendant's lies and efforts to change the subject only served to confirm the reasonableness of Trooper Hope's suspicions that some nefarious activity was afoot. Further, they suggest that Defendant exercised free will in that they evidence that he made a conscious decision to attempt to evade detection and divert Trooper Hope from his investigation.

126. As we stated above, the existence and character of the initial detention was not unduly coercive. Trooper Hope was driving an unmarked car. He only activated his lights and "tapped" his siren to alert Defendant to the fact that he wanted him to pull over. Defendant was not handcuffed or placed in a police vehicle during this interaction and Trooper Hope did not have his gun drawn. There is no evidence indicating that either of the other two Troopers had their weapons drawn. Trooper Hope's colloquy with Defendant was cordial and conversational. The stop occurred in the

49

daytime hours of the morning, at approximately 9:51 a.m., on a well traveled public highway.

127. Although certainly the stop had some indicia of coerciveness, as is to be expected when a uniformed officer directs a motorist to pull over to the side of the road and two additional uniformed officers driving marked cars pull up behind him, we do not consider the presence of these two additional Troopers, who were called for officer safety purposes, so coercive as to convert this subsequent interaction into an investigative detention.

128. Defendant was expressly informed that he was free to leave. Of course, as we stated above, his means of doing so were limited, not by Trooper Hope's conduct, but by the fact that he had been stopped on a limited access public highway while operating a vehicle without authorization from the owner. His own conduct restricted his choices. Trooper Hope gave Defendant the opportunity to make a phone call to have someone come pick him up but Defendant did not take advantage of that opportunity. Trooper Hope offered to drive Defendant to the next interchange to await a ride and Defendant did not accept this option either.

129. Although Defendant was not informed that he had a right to decline his consent to the search, as we stated above, this admonition is neither mandatory nor determinative. *See Commonwealth v. Smith*, 836 A.2d 5[14] (Pa. 2003)("[T]he mere fact that appellant was not specifically informed that she could refuse to cooperate and was free to end the encounter did not make the encounter a seizure for Fourth Amendment purposes."). Further, Defendant is not a neophyte with respect to his experience with the

50

criminal justice system. He has previously been arrested for drug and weapons offenses, as well as DUI, and had $87,000.00 in cash seized from him in a stop in California.

130. The majority of the factors outlined in *Kemp, supra*, for determining whether a consent to a warrantless search is voluntary, weigh heavily in favor of a finding that Defendant's permission to Trooper Hope to search his personal belongings was made knowingly, intelligently and voluntarily.

131. These factors include the absence of unjustifiable police excesses; the limited physical contact between Defendant and Trooper Hope as well as the fact that the physical contact that occurred was precipitated by Defendant's consent; the minimal direction of Defendant's movements by Trooper Hope beyond that necessary to effectuate the valid traffic stop and ensure Defendant's and Trooper Hope's safety; the cordial and conversational demeanor of the Troopers at all times; the location of the stop on a busy limited access public highway in broad daylight; Defendant's efforts to divert suspicion away from himself, which demonstrate a conscious attempt to manipulate the situation to his benefit; the relative lack of coerciveness characterizing the initial detention; and the fact that he was told he was free to leave and given the opportunity to make arrangements for his departure.

132. Because Defendant's consent to search his personal belongings was voluntary, Trooper Hope's search of the boxes in the back storage area of the Tahoe and his search of the storage bag located in the interior of the vehicle, which contained one of the cell phones found, was lawful and did not violate either the Fourth Amendment to the United States Constitution or Article I, Section 8 of the Pennsylvania Constitution. *See* Commonwealth v. By, 812 A.2d 1250 (Pa. Super. 2002), *appeal denied*, 839 A.2d 350

51

(Pa. 2003)(one exception to the prohibition against warrantless searches is a search conducted pursuant to consent voluntarily given).

133. Similarly, the consent of Hertz to search the interior of the Tahoe was voluntarily given, as there were no coercive aspects to the Troopers' contact with Hertz whatsoever and Hertz had a vested interest in discovering the purposes to which its vehicle had been put without its authorization.

134. Because we find that Hertz gave its consent to search the Tahoe freely and voluntarily, Trooper Hope's discovery of the firearm in the storage area behind the front passenger's seat and the cell phone in the center console of the front of the vehicle did not violate either Hertz' or Defendant's Fourth Amendment or Article I, Section 8 rights.

135. Trooper Hope's reasonable suspicion of criminal activity ripened into probable cause to arrest when he discovered, via the lawful consensual search, marijuana in the brown boxes stored in the back of the Tahoe.

### D. Voluntariness of Statements

136. The Fifth Amendment to the United States Constitution provides,

> No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb; *nor shall be compelled in any criminal case to be a witness against himself*, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

United States Const., Amend. V (emphasis added).

52

137. Article I, Section 9 of the Pennsylvania Constitution provides,

In all criminal prosecutions the accused hath a right to be heard by himself and his counsel, to demand the nature and cause of the accusation against him, to be confronted with the witnesses against him, to have compulsory process for obtaining witnesses in his favor, and, in prosecutions by indictment or information, a speedy public trial by an impartial jury of the vicinage; *he cannot be compelled to give evidence against himself,* nor can he be deprived of his life, liberty or property, unless by the judgment of his peers or the law of the land. The use of a suppressed voluntary admission or voluntary confession to impeach the credibility of a person may be permitted and shall not be construed as compelling a person to give evidence against himself.

Pa. Const., Art. I, § 9 (emphasis added).

138. Because Defendant was not subjected to a custodial detention prior to the time Trooper Stropas formally arrested Defendant, Defendant was not entitled to *Miranda* warnings prior to the time he was formally arrested by Trooper Stropas. *See In re V.H.,* 788 A.2d 976 980 (Pa. Super. 2001), *appeal denied,* 808 A.2d 573 (Pa. 2002)(*Miranda* warnings are only required in the circumstance of custodial interrogation).

139. We have already determined that Defendant's consent to search was voluntary.

140. To the extent that Defendant made other inculpatory statements,[3] which arguably might include his untruthful responses to Trooper Hope's questions and

---

[3] Other than his untruthful responses to Trooper Hope's questions, beginning with his statement that he borrowed the rental vehicle from his aunt, continuing with his statement that he had only been arrested once before for DUI a year ago, and finally ending with his statements to the effect that there were no contraband or weapons in the vehicle, and his statement that everything in the vehicle belonged to him, we are not aware of any incriminating statements, confessions, or admissions made by the Defendant prior to the time he was placed in handcuffs by Trooper Stropas. Defendant has not identified in his Motion any such statements that he claims are eligible for suppression.

53

his admission that everything in the vehicle belonged to him, we find his statements to Trooper Hope were all voluntarily made.

141.     The test for determining the voluntariness of statements to the police looks to the totality of the circumstances surrounding the giving of the statements. *Commonwealth v. Perez*, 845 A.2d 779 785 (Pa. 2004).

142.     Some of the factors to be considered in determining voluntariness include:     the duration and means of interrogation; the defendant's physical and psychological state; the conditions attendant to the detention; the attitude exhibited by the police during the interrogation; and any other factors which may serve to drain one's powers of resistance to suggestion and coercion. *Perez, supra.*

143.     An analysis of these factors indicates that Defendant's statements to Trooper Hope were made voluntarily.

144.     With respect to the first factor, the duration and means of interrogation, we have already stated our determination that the entire stop, including Trooper Hope's subsequent questioning of Defendant and search of Defendant's belongings, lasted approximately forty-five (45) to fifty-five (55) minutes, or under one hour.  The means of interrogation was simply verbal questioning.  We do not find that either of these circumstances, individually or combined, were of such a coercive nature as to drain Defendant's powers of resistance or overbear his will.   The fact that Defendant responded untruthfully to Trooper  Hope's questions from the outset of their interaction indicates that Defendant was indeed able to resist Trooper Hope's inquiries and exert his own free will.

145. As far as the Defendant's physical and psychological states are concerned, we have no evidence indicating that Defendant's physical state was compromised in any way, and, although he exhibited some behaviors indicative of nervousness, he still had the presence of mind to try to divert Trooper Hope's inquiry and evade detection by lying to Trooper Hope as well as by repeatedly requesting Trooper Hope's permission to drive the vehicle to his destination. Defendant ability to exercise his free will was not impaired in any way by a physical or psychological infirmity.

146. With respect to the third factor, the conditions attendant to the detention, as we have stated previously, Defendant was stopped in the daylight hours of the morning of November 20, 2009 on a limited access public highway. He was not physically restrained and the only physical contact between Defendant and any Trooper was a pat-down frisk for officer safety conducted with Defendant's consent. His movements were not directed beyond the extent necessary to accomplish the stop of Defendant's vehicle and ensure the safety of Defendant and the attending Troopers. Although there were three uniformed Troopers present, two of whom drove marked cars, the record indicates that all of Defendant's pre-arrest interaction occurred with Trooper Hope. We do not find that the presence of the two additional Troopers for safety purposes, whom Trooper Hope had either called for backup or who had arrived of their own accord, made this stop so coercive as to overbear the will of the Defendant or drain his powers of resistance. Again, Defendant's repeated untruths to Trooper Hope indicate that his powers of resistance were well intact.

55

DOC 2012/03/22 DOC 2012/03/22 DOC

147. With respect to the fourth factor, the attitude exhibited by the police during interrogation, we would reiterate here that all of the Troopers were at all times polite, conversational and respectful to the Defendant.

148. Defendant was advised that he was free to leave and given the choice of either calling for someone to come pick him up or getting a ride from one of the Trooper's to the nearest interchange to await transportation.

149. We have no reason to conclude that Defendant is other than a reasonably mature adult who has had some significant experience with the criminal justice system, particularly with respect to the type of offense for which he was arrested here.

150. Given Defendant's experience and relative criminal sophistication, evidenced, if the events of November 20, 2009 as narrated by Troopers Hope and Straniere are to be believed, by Defendant's use of a third-party rental vehicle to transport large quantities of marijuana, we conclude that the minimal coercive aspects of Defendant's interactions with the Troopers on November 20, 2009, such as the number of Troopers present and the relative seamlessness of the transition between the traffic stop and subsequent questioning, were not sufficient to overbear his will or drain his powers of resistance. His attempts to manipulate the questioning and redirect Trooper Hope to his own agenda evidence that Defendant's capacity to exercise free will and his powers of resistance were unimpaired.

151. All of the factors set forth in *Perez, supra* weigh in favor of a determination that the statements Defendant made to Trooper Hope were given voluntarily.

56

152. Consequently, we find that Defendant's statements to Trooper Hope were voluntary and did not violate Defendant's rights under either the Fifth Amendment to the United States Constitution or Article I, Section 9 of the Pennsylvania Constitution.

153. Accordingly, we enter the following:

COMMONWEALTH OF PENNSYLVANIA : IN THE COURT OF COMMON PLEAS

vs. : CHESTER COUNTY, PENNSYLVANIA

KASEIM WHITNEY : NO. CR-0001355-2010

: CRIMINAL ACTION--LAW

*Marilyn M. Seide, Esquire, for the Commonwealth*
*Eugene P. Tinari, Esquire, for the Defendant*

## O R D E R

AND NOW, this _31st_ day of _August_ , 2010, upon

consideration of Defendant's Omnibus Pre-Trial Motion for Relief, the Commonwealth's

response thereto, the evidence adduced at a hearing held on June 22, 2010, and the

arguments of able counsel, it is hereby ORDERED AND DECREED that said Motion is

DENIED and DISMISSED.

BY THE COURT:

_____
Anthony A. Sarcione,                    J.

58